**THE UNITED STATES COURT OF INTERNATIONAL TRADE**

*BEFORE*: The Honorable Leo M. Gordon, Senior Judge

| | |
|---|---|
| **HTM MBS LLC**,<br><br>Plaintiff,<br><br>v.<br><br>**United States**,<br><br>Defendant,<br><br>and<br><br>**Aluminum Extrusions Fair Trade Committee**,<br><br>Defendant-Intervenor. | Ct. No. 26-02863 |

**PLAINTIFF HTM MBS LLC'S RULE 56.2 MOTION FOR JUDGMENT ON THE AGENCY RECORD**

Pursuant to Rule 56.2 of the U.S. Court of International Trade, Plaintiff, HTM MBS LLC ("MBS or "Plaintiff") hereby moves for judgment on the agency record with regard to the U.S. Department of Commerce's ("Commerce") final scope ruling with respect to Plaintiff's wall standoffs. *See* Memorandum from Maureen Shaheen to Scot Fullerton, "Antidumping and Countervailing Duty Orders on Aluminum Extrusions from the People's Republic of China: Final Scope Ruling on HTM MBS LLC Request on Wall Standoffs and Component Thereof," A-570-967/C-570-968 (March 24, 2026) ("Final Scope Ruling").

For the reasons explained in the accompanying brief, Plaintiff moves the Court to hold the contested portions of Commerce's Final Scope Ruling are not supported by substantial evidence or not in accordance with law. Plaintiff further moves that the Court remand

Commerce's determination for further proceedings consistent with the order and opinion of the Court.

Respectfully submitted,

/s/ Heather Jacobson
Heather Jacobson
NAKACHI, ECKHARDT, AND JACOBSON P.C.
450 Alaska Way South, Suite 200
Seattle, WA 98104
Phone: (206) 774-0927
Email: HJacobson@TradeLawCounsel.com
*Counsel to HTM MBS LLC*

Dated: October 2, 2026

**THE UNITED STATES COURT OF INTERNATIONAL TRADE**

*BEFORE*: The Honorable Leo M. Gordon, Senior Judge

| | |
|---|---|
| **HTM MBS LLC**, | |
| Plaintiff, | |
| v. | |
| **United States**, | Ct. No. 26-02863 |
| Defendant, | |
| and | |
| **Aluminum Extrusions Fair Trade Committee**, | |
| Defendant-Intervenor. | |

**PLAINTIFF HTM MBS LLC'S BRIEF IN SUPPORT OF RULE 56.2 MOTION FOR JUDGMENT ON THE AGENCY RECORD**

Heather Jacobson
NAKACHI, ECKHARDT, AND JACOBSON P.C.
450 Alaska Way South, Suite 200
Seattle, WA 98104
Phone: (206) 774-0927
Email: HJacobson@TradeLawCounsel.com
*Counsel to HTM MBS LLC*

Dated: October 2, 2026

## TABLE OF CONTENTS

**I. INTRODUCTION AND SUMMARY OF ARGUMENT .................................................. 1**

**II. STATEMENT PURSUANT TO RULE 56.2............................................................... 3**

A. ADMINISTRATIVE DETERMINATION UNDER APPEAL ........................................................... 3

B. ISSUES OF LAW PRESENTED ........................................................................................ 3

C. STATEMENT OF REASONS FOR REMANDING COMMERCE'S DETERMINATION ........................ 4

**III. STATEMENT OF FACTS ........................................................................................ 4**

A. DESCRIPTION OF WALL STANDOFFS ............................................................................. 4

B. PROCEDURAL HISTORY ................................................................................................ 5

**IV. STANDARD OF REVIEW........................................................................................ 7**

**V. ARGUMENT .............................................................................................................. 8**

A. COMMERCE'S ANALYSIS OF MBS'S SCOPE APPLICATION WAS INCONSISTENT WITH THE REGULATION AND THEREFORE UNLAWFUL ............................................. 9

*1. Commerce's (k)(1) Analysis was Deficient and Therefore Unlawful ........................... 10*

*2. The Record Demonstrates that the (k)(2) Factors Were Required for a Lawful Scope Ruling ........................................................................................................... 14*

B. COMMERCE ERRONEOUSLY FOUND THAT MBS'S WALL STANDOFFS ARE NOT EXCLUDED FASTENERS ............................................................................. 16

*1. MBS's Wall Standoffs Are Fasteners ............................................................................ 16*

*2. Fasteners Are Excluded from the Scope ....................................................................... 20*

C. COMMERCE'S PRELIMINARY ANALYSIS OF THE APPLICABILITY OF THE FINISHED GOODS EXCLUSION WAS DEFICIENT .......................................................... 25

**VI. CONCLUSION ........................................................................................................ 27**

## TABLE OF AUTHORITIES

### Cases

*Allegheny Bradford Corp. v. United States*,
342 F. Supp. 2d 1172 (Ct. Int'l Trade 2004) ... 7, 22
*Aluminum Extrusions Fair Trade Committee v. United States*,
617 F. Supp. 3d 1296 (Ct. Int'l Trade 2023) ... 25, 26-27
*Atkore Steel Components, Inc. v. United States*,
313 F. Supp. 3d 1374 (Ct. Int'l Trade 2018) ... 11
*Christopher v. SmithKline Beecham Corp.*,
567 U.S. 142 (2012) ... 8
*Duferco Steel, Inc. v. United States*,
293 F.3d 1087 (Fed. Cir. 2002) ... 11, 16
*Eckstrom Indus., Inc. v. United States*,
254 F.3d 1068 (Fed. Cir. 2001) ... 7
*Fedmet Res. Corp. v. United States*,
755 F.3d 912 (Fed. Cir. 2014) ... 28
*Fuji Photo Film Co. v. Int'l Trade Comm'n,*
474 F.3d 1281 (Fed. Cir. 2007) ... 8
*King Supply Co., LLC v. United States*,
674 F.3d 1343 (Fed. Cir. 2012) ... 7
*Magnum Magnetic Corp. v. United States*,
167 F.4th 1187 (Fed. Cir, 2026) ... 12
*Meridian Products, LLC v. United States*,
851 F.3d 1375 (Fed. Cir. 2017) ... 7, 14, 22
*Mid Continent Nail Corp. v. United States*,
725 F.3d 1295 (Fed. Cir. 2013) ... 12
*Novosteel SA v. United States*,
284 F.3d 1261 (Fed. Cir. 2002) ... 11
*Securities and Exchange Commission v. Chenery Corp.*,
318 U.S. 80 (1943) ... 19
*Shenyang Yuanda Aluminum Industry Engineering Co., Ltd. v. United States*,
961 F.Supp.2d 1291 (Ct. Int'l Trade 2014) ... 25-27
*Stein Industries Inc. v. United States*,
365 F.Supp.3d 1364 (Ct. Int'l Trade 2019) ... 12
*Valeo North America, Inc. v. United States*,
146 F.4th 1374 (Fed. Cir. 2025) ... 10
*Vandewater International Inc. v. United States*,
130 F.4th 981 (Fed. Cir. 2025) ... 7, 10, 11
*Vietnam Finewood Company Limited v. United States*,

633 F. Supp. 3d 1243 (Ct. Int'l Trade 2023) .................................................... 10
*Whirlpool Corporation v. United States*,
890 F.3d 1302 (Fed. Cir. 2018) ........................................................................ 7, 15

**Statutes**

19 U.S.C. §1516a ...................................................................................................... 7

**Regulations**

19 C.F.R. § 351.225 ........................................................................................... *passim*

**Other Authorities**

*Aluminum Extrusion from the People's Republic of China: Antidumping Duty Order*, 76 Fed. Reg. 30,650 (May 26, 2011) ............................................................................. *passim*
*Aluminum Extrusion from the People's Republic of China: Countervailing Duty Order*, 76 Fed. Reg. 30,653 (May 26, 2011) ............................................................................. *passim*
*Aluminum Extrusions From the People's Republic of China: Continuation of Antidumping Duty Order and Countervailing Duty Order*, 87 Fed. Reg. 66,128 (November 2, 2022) .................. 5
Final Results of Redetermination Pursuant to Court Remand in *Asia Sourcing Corp. v. United States,* Ct. No. 13-00161 (Ct. Int'l Tr. June 30, 2014) ................................................ 12, 17, 24
Memorandum from Robert Davis to Alex Villanueva, "Antidumping and Countervailing Duty Orders on Aluminum Extrusions from the People's Republic of China: Final Scope Ruling on HTM MBS LLC's LED Standoffs Kit and LED Sign Clamp Mounting Kits" A-570-967/C-570-968 (July 8, 2026) ................................................................................................ 15
*Regulations To Improve Administration and Enforcement of Antidumping and Countervailing Duty Laws*, 86 Fed. Reg. 52,300 (September 20, 2021) ..............................................10, 11, 12

## I. INTRODUCTION AND SUMMARY OF ARGUMENT

Litigation surrounding the scope of the aluminum extrusions Orders is not new to the Court. The scope of those Orders has confounded importers since the beginning, resulting in constant requests to the Department of Commerce ("Commerce") for clarification and, not infrequently, appeals to the Court. This appeal presents the issue of whether wall standoffs, used to fasten signage to a wall, fall within an Order originally designed to provide relief for large manufacturers of construction and home improvement materials. The record of this proceeding shows that Commerce performed an unlawfully truncated analysis of the regulatory factors covering scope proceedings, and made findings regarding the coverage of the merchandise at issue that were inconsistent with the record.

First, Commerce failed to perform the kind of deep analysis of the factors described in 19 C.F.R. §351.225(k)(1) and (2) that the regulation contemplates. Though Commerce itself has acknowledged that review of the (k)(1) factors is necessary in most cases, in this case Commerce unlawfully restricted its analysis to a limited consideration of the affirmative language in the scope, with only superficial reference to other interpretive sources. Further, the complexity of the record before Commerce necessitates consideration of the factors described in 19 C.F.R. § 351.225(k)(2), which Commerce declined to consider. Those factors, when considered, would reveal that the wall standoffs imported by HTM MBS LLC ("MBS" or "Plaintiff") are fasteners that are distinct from the merchandise covered by the original investigation, and are thus non-subject.

Second, Commerce's decision that MBS's wall standoffs are not excluded as fasteners is contrary to substantial evidence and not in accordance with law. Commerce's analysis of the record did not present a conclusion as to whether MBS's wall standoffs are fasteners as that term

is used in the scope language, despite ample evidence on the record that the wall standoffs fall within the definition established by Commerce of fasteners for purposes of the Orders. Commerce rejected MBS's arguments that whether standoffs constitute fasteners was meaningful, despite two important references to fasteners in the scope itself. Commerce's analysis of MBS's arguments about the record largely centered on rejecting the premise. The record shows that MBS's wall standoffs are excluded fasteners, and Commerce's decision to the contrary was unsupported by substantial evidence and not in accordance with law.

Third, Commerce's finding that MBS's wall standoffs are not finished goods within the meaning of the scope is inconsistent with the record and not in accordance with law. Each individual wall standoff is imported in its finished condition and can independently perform the fastening function for which it is designed. Commerce's conclusion that the "finished goods" exclusion did not apply to MBS's wall standoffs was largely subsumed in its consideration of the merchandise as a "kit." The controlling case law, however, shows that it was appropriate to determine that MBS's wall standoffs qualified for the finished goods exclusion. As a result, Commerce's decision to the contrary was unsupported by substantial evidence and not in accordance with law.

For the foregoing reasons, MBS requests that this Court remand Commerce's scope ruling for the further proceedings consistent with the controlling regulations and record of the proceeding.

## II. STATEMENT PURSUANT TO RULE 56.2

### A. Administrative Determination Under Appeal

Plaintiff seeks judicial review of the final scope ruling issued by Commerce determining that certain aluminum wall standoffs and components thereof are covered by the antidumping and countervailing duty orders on aluminum extrusions from China. *See* Memorandum from Maureen Shaheen to Scot Fullerton, "Antidumping and Countervailing Duty Orders on Aluminum Extrusions from the People's Republic of China: Final Scope Ruling on HTM MBS LLC Request on Wall Standoffs and Component Thereof," A-570-967/C-570-968 (March 24, 2026) ("Final Scope Ruling") (P.R. 6/5)[1].

### B. Issues of Law Presented

Plaintiff's appeal raises the following issues:

1. Commerce's analysis was legally deficient in that it performed an unlawfully proscribed consideration of the (k)(1) factors and failed to consider the (k)(2) factors under 19 C.F.R. § 351.225;

2. Commerce's findings regarding whether MBS's wall standoffs were fasteners and thus whether they are covered by the scope was unsupported by substantial evidence and not in accordance with law; and

3. Commerce's determination that the finished goods exclusion did not apply to MBS's wall standoffs was unsupported by substantial evidence and not in accordance with law.

[1] There are independent record indexes for the AD and CVD segments of the underlying administrative proceeding. For each citation to the record the document number from the AD segment is reflected first and the record number from the CVD segment follows. For example, the citation is reflected in the following way (P.R. AD/CVD). In situations where the document only appears in the AD record, a single number is provided.

### C. Statement of Reasons for Remanding Commerce's Determination

Commerce's scope determination should be remanded because it is not supported by substantial evidence and is otherwise not in accordance with law. The reasons are set forth below.

## III. STATEMENT OF FACTS

### A. Description of Wall Standoffs

Plaintiff is a U.S. importer of products that include aluminum wall standoffs and components thereof. Scope Application at 2 (P.R. 39/11). Wall standoffs are fasteners that are used to attach media – typically signs and other visual media - at a fixed distance from a vertical mounting surface (i.e., a wall). Wall standoffs consist of a head with a permanently attached threaded head and shank, an open-ended internally threaded aluminum barrel, and silicon washers. The head, shank and barrel are made of extruded aluminum. Scope Application at 6 (P.R. 39/11).

Most standoffs are imported fully assembled, with all components necessary to function as standoffs. In addition, components of "customizable" standoffs are imported and sold separately, in order to allow the user to select the specific size and style of the standoff. The components of a customizable standoff consist of a cap, a barrel, and a threaded rod that performs the same function as the shank in a finished, non-customizable standoff. Scope Application at 15, Exs. 3-7 (P.R. 39, 38/11, 10).

Wall standoffs achieve their fastening function as follows: (1) the head with a permanently attached externally threaded shank (*i.e.*, a bolt or fastener) passes through a hole in the media; (2) the shank fastens to one end of the internally threaded barrel via the threading on both components (the barrel acting as a nut); and (3) the barrel fastens to the mounting surface via a screw. If imported separately, caps and barrels function the same as above, with an

externally threaded rod replacing the head's externally threaded shank. Washers are used with both the head/barrel and the cap/rod/barrel combinations. Scope Application at 5, Exs. 1-9 (P.R. 39, 38/11, 10).

### B. Procedural History

In May 2011, Commerce issued antidumping and countervailing duty orders with regard to aluminum extrusions from China. *See Aluminum Extrusion from the People's Republic of China: Antidumping Duty Order*, 76 Fed. Reg. 30,650 (May 26, 2011); *Aluminum Extrusion from the People's Republic of China: Countervailing Duty Order*, 76 Fed. Reg. 30,653 (May 26, 2011) (collectively, "Orders"). In November 2022, Commerce issued a notice of continuation of the Orders. *See Aluminum Extrusions From the People's Republic of China: Continuation of Antidumping Duty Order and Countervailing Duty Order*, 87 Fed. Reg. 66,128 (November 2, 2022).

In June 2023, U.S. Customs & Border Protection ("CBP") determined that the aluminum wall standoffs imported by Plaintiff were covered by the antidumping and countervailing duty orders on aluminum extrusions from China.

On March 6, 2025, Plaintiff filed a scope ruling request with Commerce. *See generally*, Scope Application (P.R. 39, 38/11, 10). In that request, Plaintiff demonstrated to Commerce that the aluminum wall standoffs and wall standoff components it imported did not fall under the scope of the Orders. Specifically, MBS demonstrated that the wall standoffs were finished fasteners and that the language of the Orders and available interpretive material show that fasteners, regardless of constituent material, are not covered by the Orders.

Pursuant to that request, Commerce initiated a scope inquiry with regard to the aluminum wall standoffs and wall standoff components on March 21, 2025. *See* Memorandum from

Thuydan Tan to Norbert Gannon, "Scope Inquiry of Wall Standoffs and Components Thereof from the People's Republic of China: Initiation of Scope Inquiry," A-570-967/C-570-968 (March 21, 2025) (P.R. 35). On April 28, 2025, the Aluminum Extrusions Fair Trade Committee submitted comments on the scope ruling request. Comments on MBS' Scope Ruling Request (P.R. 26). On May 12, 2025, Plaintiff submitted rebuttal comments. Response to Petitioner Comments (P.R. 24).

On August 22, 2025, Commerce issued a preliminary scope ruling, in which it found that the wall standoffs and components thereof are covered by the scope of the Orders. *See* Memorandum from Maureen Shaheen to Scot Fullerton, "Aluminum Extrusions from the People's Republic of China: Preliminary Scope Determination on HTM MBS LLC Request on Wall Standoff and Components Thereof," A-570-967/C-570-968 (August 22, 2025) ("Preliminary Scope Ruling") (P.R. 20/4). In the Preliminary Scope Ruling, Commerce stated that the wall standoffs and components thereof "serve a mounting or fastening purpose," but that the Orders "do not categorically exclude fasteners," and that the standoffs "are not imported as complete, finished goods." *See* Preliminary Scope Ruling at 11, 12, 14 (P.R. 20/4).

On September 12, 2025, Plaintiff filed an administrative case brief in which it presented arguments identifying flaws in Commerce's reasoning and factual findings and demonstrating that the wall standoffs and components thereof are not covered by the scope of the Orders. *See* HTM MBS LLC Case Brief (P.R. 16). On September 26, 2025, the Aluminum Extrusions Fair Trade Committee filed a rebuttal brief. *See* Scope Rebuttal Brief (P.R. 12).

On March 24, 2026, Commerce issued a Final Scope Ruling finding that the aluminum wall standoffs and components thereof are covered by the scope of the Orders. Final Scope Ruling at 18 (P.R. 6/5). In the Final Scope Ruling, Commerce determined, in part, that (1) the

factors in 19 C.F.R. § 351.225(k)(1) are dispositive and it was therefore not required to consider secondary interpretive sources listed in 19 C.F.R. § 351.225(k)(2); (2) the product at issue "is not a 'fastener in its entirety' but rather a wall standoff (with a fastening function);" and (3) fasteners as a category of merchandise are not excluded from the scope of the Orders. *See* Final Scope Ruling at 13, 17 (P.R. 6/5).

On April 22, 2026, Plaintiff filed the summons that gives rise to the above-captioned proceeding. *Summons* ECF No. 1.

## IV. STANDARD OF REVIEW

The Court considers whether Commerce's scope findings are "unsupported by substantial evidence on the record, or otherwise not in accordance with law." 19 U.S.C. §1516a(b)(1)(B)(i). "Commerce is entitled to substantial deference with regard to its interpretations of its own antidumping duty orders." *King Supply Co., LLC v. United States*, 674 F.3d 1343, 1348 (Fed. Cir. 2012). Yet, "Commerce cannot 'interpret' an antidumping order so as to change the scope of th{e} order, nor can Commerce interpret an order in a manner contrary to its terms." *Eckstrom Indus., Inc. v. United States*, 254 F.3d 1068, 1072 (Fed. Cir. 2001) (citation omitted).

"{T}he question of whether the unambiguous terms of a scope control the inquiry, or whether some ambiguity exists, is a question of law." *Meridian Products, LLC v. United States*, 851 F.3d 1375, 1382 (Fed. Cir. 2017) (*citing Allegheny Bradford Corp. v. United States*, 342 F. Supp. 2d 1172, 1183 (Ct. Int'l Trade 2004)). "{T}he question of whether the product at issue meets the unambiguous scope terms is a question of fact that we review for substantial evidence." *Vandewater International Inc. v. United States*, 130 F.4th 981, 990 (Fed. Cir. 2025) (*citing Whirlpool Corporation v. United States*, 890 F.3d 1302, 1308 (Fed. Cir. 2018)).

## V. <u>ARGUMENT</u>

The core of MBS's argument is that Commerce performed a hollow analysis of its scope application, finding that its wall standoffs were covered by the scope through a narrow focus on the metal composition of the items at issue. In part, this dispute flows from the nature of the scope of the Orders at issue here. The affirmative scope language is extremely broad and the exclusions contained in the balance of the scope are notoriously difficult to parse. Here, Commerce performed a limited analysis of the scope language with little consideration for the issues MBS raised regarding Commerce's prior treatment of similar fastening devices.

"{T}he requirement that antidumping orders only be applied to merchandise that they may be reasonably interpreted to include … reflects the broader due-process principle that before an agency may enforce an order or regulation by means of a penalty or monetary sanction, it must 'provide regulated parties fair warning of the conduct {the order or regulation} prohibits or requires.'" *Mid Continent Nail Corp. v. United States*, 725 F.3d 1295, 1300-01 (Fed. Cir. 2013) (*citing Fuji Photo Film Co. v. Int'l Trade Comm'n*, 474 F.3d 1281, 1292 (Fed. Cir. 2007); *Christopher v. SmithKline Beecham Corp.*, 567 U.S. 142, 156 (2012) (alteration in original)). The nature of the aluminum extrusions Orders makes meeting this standard very difficult, and necessitates a deeper scope analysis to ensure that importers receive "adequate notice of what conduct is regulated by the order." *Fuji Photo Film Co.*, 474 F.3d at 1292. Here, MBS has fallen into the penumbras of the scope and the prescribed nature of Commerce's analysis has continued its plight.

As discussed more fully below, Commerce did not perform adequate analysis under its regulations. Effectively, Commerce relied on a truncated scope analysis to determine that MBS's wall standoffs were covered by the scope when a deeper analysis under both (k)(1) and (k)(2)

was warranted. In addition, Commerce relied heavily on this cursory analysis to discard the balance of MBS's arguments regarding the qualification of its wall standoffs for exclusion. For these reasons Commerce's findings are unsupported by substantial evidence and otherwise contrary to law.

### A. COMMERCE'S ANALYSIS OF MBS'S SCOPE APPLICATION WAS INCONSISTENT WITH THE REGULATION AND THEREFORE UNLAWFUL

Commerce's method for implementing its statutory authority in scope determinations is detailed in 19 C.F.R. § 351.225. Specifically, subsection (k) provides for a staged approach to making its determinations. First, Commerce will "consider the language of the scope and may make its determination on this basis alone if the language of the scope . . . is dispositive." 19 C.F.R. § 351.225(k)(1). Where the scope language is not dispositive, Commerce may consider sources enumerated in subsections (k)(1)(i) and (k)(1)(ii), which include: the description in the petition, descriptions in the initial investigation, prior scope rulings, and materials flowing from proceedings before the International Trade Commission. In those situations where the scope language and (k)(1) factors are not dispositive, subsection (k)(2) directs Commerce to examine five additional factors: physical characteristics, user expectations, ultimate use, channels of trade, and manner of advertisement. 19 C.F.R. § 351.225(k)(2)(i).

In the Final Scope Ruling, Commerce found that MBS's wall standoffs were covered by the scope of the Orders "based on 19 CFR 351.225(k)(1) and the description of the product contained in the Scope Ruling Application." Final Scope Ruling at 18 (P.R. 6/5). As a result, Commerce made its determination consistent with 19 C.F.R. § 351.225(d). Commerce's analysis, however, relied almost entirely on an analysis of the scope language in isolation, without the interpretive aids set forth in 19 C.F.R. § 351.225(k)(1). While the regulations and case law permit such cursory analysis where the scope language itself is dispositive, that is

patently not the case here. The issues raised in MBS's scope ruling request require not only a more fulsome consideration of the (k)(1) factors, but also examination of the factors in subsection (k)(2). As discussed more fully below, Commerce's decision to limit its analysis to a cursory examination of the (k)(1) factors, and not to consider the factors set forth in subsection (k)(2), was unlawful.

1. *Commerce's (k)(1) Analysis was Deficient and Therefore Unlawful*

**a. Consideration of the (k)(1) factors is required unless the plain scope language is "unambiguous."**

The current iteration of section 19 C.F.R. § 351.225(k)(1), promulgated in September 2021, incorporates into the regulation certain rulings of this Court and the U.S. Court of Appeals for the Federal Circuit ("CAFC") with regard to the appropriate steps in scope analysis. In particular, the September 2021 amendment to section 19 C.F.R. § 351.225(k)(1) clarifies that scope analysis must always begin with review of the plain language of the scope. *See Regulations To Improve Administration and Enforcement of Antidumping and Countervailing Duty Laws*, 86 Fed. Reg. 52,300, 52,323 (September 20, 2021). This step, which was not previously expressly stated in the regulation, is often referred to by the courts as "(k)(0)" as a means of locating it at the beginning of the regulation's tiered analysis. *See, e.g., Vandewater International Inc.*, 130 F.4th at 992; *Valeo North America, Inc. v. United States*, 146 F.4th 1374,1377 (Fed. Cir. 2025).

The amended subsection 351.225(k)(1) also incorporates the courts' acknowledgment that where the scope language alone is "dispositive," review of the (k)(1) factors is not necessary. *See, e.g., Vietnam Finewood Company Limited v. United States*, 633 F. Supp. 3d 1243, 1254 (Ct. Int'l Trade 2023) ("{I}n some cases, an order's scope, by itself, may be sufficiently plain in relationship to a particular product that no resort to the (k)(1) sources is necessary. In other cases,

however, it may be necessary to consider the (k)(1) sources to confirm that the scope language plainly speaks to the inclusion or exclusion of a particular product."); *Duferco Steel, Inc. v. United States*, 293 F.3d 1087, 1097 (Fed. Cir. 2002) ("{R}eview of the petition and the investigation may provide valuable guidance as to the interpretation of the final order. But they cannot substitute for language in the order itself."). However, the courts have made clear that unambiguous scope language is rare, as "{o}nly a 'low threshold' must be cleared to justify a finding of ambiguity, necessitating further review." *Atkore Steel Components, Inc. v. United States*, 313 F. Supp. 3d 1374, 1380 (Ct. Int'l Trade 2018) (*quoting Novosteel SA v. United States*, 284 F.3d 1261, 1270–72 (Fed. Cir. 2002)). Commerce itself has stated that scope decisions based solely on the scope language are the exception rather than the rule: "{I}n most scope inquiries the language of the scope is written in more general or broad terms, and, therefore, in the majority of scope inquiries, it is likely that the current (k)(1) sources would be considered by Commerce in determining if a product is covered by the scope of an order in a scope ruling." 86 Fed. Reg. 52,300, 52,323. Even after the amendments to the regulation, the courts have warned of the dangers of disregarding the (k)(1) and (k)(2) factors; in *Vandewater*, for example, the Federal Circuit observed that "the (k)(0) inquiry could effectively subsume the (k)(1) and (k)(2) analyses, disrupting the current design of the scope inquiry . . . Such an outcome would frustrate, if not impede, the purpose and intent of the U.S. trade statutes." *Vandewater International Inc.*, 130 F.4th at 992.

Moreover, Commerce's comments on its own regulations suggest that the first step of the scope analysis should include a deep analysis of the (k)(1) factors. In the announcement of the rule, Commerce stated that the (k)(1) sources "were never intended by Commerce to be separate from the initial analysis of the scope language, but were instead to be interpretive tools that could

be considered by Commerce, at its discretion and under consideration of the arguments on the administrative record, to determine the meaning of the scope of the order." 86 Fed. Reg. 52,300, 52,323.

Commerce's description of a robust (k)(1) step is bolstered by judicial analysis. In *Stein Industries*, the Court found that a conclusory (k)(1) assessment could "not save its determination." *Stein Industries Inc. v. United States*, 365 F.Supp.3d 1364, 1372 (Ct. Int'l Trade 2019). Further, in *Magnum Magnetic*, the Court found that "Commerce has the discretion to consider (k)(1) factors in assessing the meaning of the scope language, regardless of whether the language appears to be ambiguous or not." *Magnum Magnetic Corp. v. United States*, 167 F.4th 1187, 1195 (Fed. Cir, 2026). Together these cases demonstrate that a fulsome (k)(1) analysis is crucial to ensuring that Commerce's scope findings are consistent with the record and Commerce's regulatory obligations.

**b. The scope language is ambiguous as to the definition of "fasteners" and whether or not fasteners fall within the scope of the Orders, and therefore additional (k)(1) analysis was required.**

The scope language of the aluminum extrusion orders is notoriously ambiguous. Commerce has previously noted that the scope term "fasteners" is undefined in the scope language, and has reviewed (k)(1) and (k)(2) factors to interpret what falls within that category. *See* Final Results of Redetermination Pursuant to Court Remand in *Asia Sourcing Corp. v. United States,* Ct. No. 13-00161 (Ct. Int'l Tr. June 30, 2014); *see also* Scope Application at Ex. 12 at p. 10, 11 (P.R. 38/10). MBS's scope request asks Commerce to determine whether that undefined term applies to a previously unconsidered type of fastener—wall standoffs. MBS's scope request further asks Commerce to determine whether the scope language taken as a whole excludes fasteners from covered merchandise. The scope language does not answer this

question. Accordingly, on both issues, full consideration of the (k)(1) factors is both appropriate and necessary.

In its preliminary ruling, Commerce considered the scope language and a single prior scope ruling. Preliminary Scope Ruling at 9, 10-12 (P.R. 20/4). MBS, however, raised issues related to whether fasteners were covered and provided evidence related to that issue. The preliminary ruling acknowledged that these sources "may support a functional classification of the components as fasteners," but the Department rejected the sources on the grounds that the definitions "conflict with primary interpretive sources including the scope language, which does not categorically exclude fasteners." Preliminary Scope Ruling at 14 (P.R. 20/4). Commerce's final ruling also focused heavily on a brief analysis of the scope language with only a narrow reference to other (k)(1) sources. More was required for the ruling to be lawful.

Robust analysis of the (k)(1) factors is not evident in the administrative determination in this case. Commerce spent the majority of its preliminary and final determinations contesting MBS's arguments regarding fasteners but considered very little (k)(1) evidence. Commerce makes no reference to the petition nor anything presented to the International Trade Commission. The history of this order, and the case law covering Commerce's method of analysis, demonstrates that this kind of deeper analysis is hugely important both to resolve MBS's particular situation and to provide added certainty for future applicants.

In rejecting MBS's arguments Commerce states that "{t}o the extent MBS relies on commercial definitions that describe wall standoffs as fasteners to argue exclusion from the scope, those definitions conflict with primary interpretive sources including the scope language, which does not categorially exclude fasteners." Preliminary Scope Ruling at 14 (P.R. 20/4). Commerce does not, however, identify which primary interpretive sources, other than the scope

language, it is referring to. This is precisely the kind of analysis that is only appropriate where the scope language itself is "dispositive." 19 C.F.R. § 351.225(k)(1). Instead, Commerce relies on an unsupported statement regarding its assessment of the scope language when the scope language does not itself resolve the issue of whether fasteners are covered. This analysis was conclusory and inconsistent with the regulation, and thus must be remanded.

2. *The Record Demonstrates that the (k)(2) Factors Were Required for a Lawful Scope Ruling*

Pursuant to 19 C.F.R. § 351.225(k)(2), where the scope language and the (k)(1) factors are not dispositive, Commerce is required to analyze the (k)(2) factors. The record of this proceeding shows that the relevant scope language is sufficiently ambiguous that consideration of secondary interpretive sources under 19 C.F.R. § 351.225(k)(2) is required under the regulation.

MBS's argument relies primarily on the definition of its wall standoffs as a fastener. To that end, MBS submitted two sets of marketing materials that clearly identify standoffs, similar to MBS's, as fasteners. Scope Application at Exs. 13, 14 (P.R. 38/10). This is precisely the kind of evidence contemplated by the (k)(2) factors. Specifically, this evidence is relevant under 19 C.F.R. § 351.225(k)(2)(i)(A) as it reveals the expectations of the ultimate user. In this case, it is directly relevant to resolving the key issue of whether MBS's wall standoffs are excluded fasteners—a topic on which the scope language and (k)(1) factors are silent. The court has found that scope terms are "unambiguous if they have a single clearly defined or stated meaning." *Meridian Prods.*, 851 F.3d at 1381 n.7 (internal quotation marks and citation omitted). That is not the situation in this case. The ambit of the term fasteners, as it is used in the scope, remains unresolved.

Here, the issue of whether MBS's wall standoffs are covered by the scope is sufficiently complicated that a (k)(2) analysis is appropriate. Wall standoffs are a finished good that is consumer-focused not the kind of intermediate product that Commerce was considering in the scope ruling that it references in the proceeding at issue here. *See* Final Scope Ruling at 6 (P.R. 6/5) (citing the scope ruling underlying the *Meridian* cases). Importantly, a number of MBS's very similar products that CBP found to be subject to the orders were found by Commerce to be out of scope. *See, e.g.*, Memorandum from Robert Davis to Alex Villanueva, "Antidumping and Countervailing Duty Orders on Aluminum Extrusions from the People's Republic of China: Final Scope Ruling on HTM MBS LLC's LED Standoffs Kit and LED Sign Clamp Mounting Kits" A-570-967/C-570-968 (July 8, 2026). This is precisely the kind of marginal case that would at a minimum benefit from a more fulsome (k)(1) analysis and is sufficiently ambiguous that a (k)(2) analysis is necessary. Commerce's approach here falls well short of the regulation.

In factual scope matters, Commerce is afforded significant deference. The method of Commerce's analysis is, however, an issue of law. On issues of law, the Court owes no deference to Commerce's interpretation of is obligations under the regulation. The Court has previously held that "{t}he question of whether the unambiguous terms of a scope control the inquiry, or whether some ambiguity exists, is a question of law." *Whirlpool Corporation*, 890 F.3d at 1302.

Here, Commerce's interpretation of its analytical obligations under that statute were unlawful, and MBS asks that the Court remand this aspect of Commerce's determination for further proceedings consistent with Commerce's obligation to review the (k)(1) factors and, in this situation, review consider the (k)(2) factors.

## B. COMMERCE ERRONEOUSLY FOUND THAT MBS'S WALL STANDOFFS ARE NOT EXCLUDED FASTENERS

In addition to the legal flaws evident in Commerce's inchoate scope analysis, Commerce's position on the scope language was unsupported by substantial evidence. When a party challenges a scope determination, the court's objective is to determine whether the scope of the order "contain{s} language that specifically includes the subject merchandise or may be reasonably interpreted to include it." *Duferco Steel, Inc.*, 296 F.3d at 1089. Here, there remains a significant question regarding whether fasteners are themselves covered by the scope of the Orders and thus whether MBS's wall standoff fasteners could reasonably be considered to be within the scope of the Orders. The following sections demonstrate that MBS's wall standoffs are fasteners, and that fasteners are not included in the scope of the Orders. As a result, Commerce's determination that MBS's wall standoffs were covered by the Orders is not supported by substantial evidence.

### *1. MBS's Wall Standoffs Are Fasteners*

The merchandise at issue here consists of engineered aluminum wall standoffs designed to fasten items to a wall. These standoffs are typically used for fastening signage, for example in a medical office, museum, or a public space. In its scope application, MBS described the merchandise at issue as follows:

> The products at issue are wall standoffs and components thereof. Wall standoffs are a collection of extruded aluminum fasteners that are used to attach media at a fixed distance from a mounting surface. Wall standoffs consist of a head with a permanently attached externally threaded shank, an open-ended internally threaded aluminum barrel, and silicon washers. If imported separately, the internally threaded cap is open at one end and attaches to the internally threaded barrel via an externally threaded rod. Wall standoffs and components thereof are imported in a variety of materials, types, shapes, sizes, colors, and finishes.

Scope Application at 5 (P.R. 39/11).

Customers can order standoffs in a variety of shapes, sizes, and combination of features. These variations include tamper-proof fasteners that prevent removal and non-aluminum materials such as stainless steel, wood, and acrylic. Functionally, wall standoffs achieve their fastening function in the following way:

> (1) the head, with a permanently attached externally threaded shank (*i.e.*, a bolt or fastener), passes through a hole in the media; (2) the shank fastens to one end of the internally threaded barrel via the threading on both components (the barrel is a nut); and (3) the barrel fastens to the mounting surface via a screw. If imported separately, caps and barrels function the same as above with a externally threaded rod replacing the head's externally threaded shank. Washers are used with both the head/barrel and the cap/rod/barrel combinations. In short, standoffs are a collection of fasteners that attach to media at a fixed distance from a mounting surface.

Scope Application at 6 (P.R. 39/11).

The language of the Orders does not specifically define fasteners, stating only that "screws, bolts, etc." are considered fasteners. *Orders* at 30,650, 30,654. Commerce subsequently examined this issue and found that merchandise that has a "fastening function" will be considered a fastener for the purposes of the Orders. Final Results of Redetermination Pursuant to Court Remand in *Asia Sourcing Corp. v. United States,* Ct. No. 13-00161 (Ct. Int'l Tr. June 30, 2014); *see also* Scope Application at Ex. 12 at p. 10, 11 (P.R. 38/10). Specifically, Commerce found that a plastic-coated cable component was not a fastener because "they do not have a fastening function, i.e. they do not attach the product to something else or attach components of the product to each other." *Id.* In the same ruling, Commerce found that certain other components did function as fasteners, stating that "we find the J-hooks and footman's loops to be fasteners because they have a fastening function, i.e., are components used to attach or fasten the ladder to the dock." *Id.* Similarly, MBS's wall standoffs perform a "fastening function" such that they should be considered fasteners under the scope of this proceeding.

A finding that MBS's wall standoffs are "fasteners" is a necessary predicate to MBS's core argument; namely, that the wall standoffs are not covered by the scope because "the *Orders* do not consider fasteners to be included in the scope." Scope Application at 19 (P.R. 39/11). However, throughout the administrative proceeding, Commerce avoided taking an explicit position as to whether the standoffs as a whole constitute "fasteners" for purposes of the scope language. *See, e.g.*, Preliminary Scope Ruling at 13-14 ("While MBS' standoffs may indeed function as fasteners, that fact alone does not exempt them from the scope.") (P.R. 20/4); Final Scope Ruling at 15-16 ("Once Commerce reasonably read the scope language as not creating any categorical exclusion for 'fasteners' as a class, it was appropriate to treat industry usage as confirming, at most, that wall standoffs can be described functionally as fasteners, but not as controlling the legal effect of that description."). In the final ruling, Commerce characterized its preliminary findings as "identif{ying} that the MBS final products are considered installation hardware, rather than standalone finished products." Final Scope Ruling at 10 (P.R. 6/5).

In the final ruling, Commerce avoided a determinative statement on whether wall standoffs could be considered fasteners and instead found that the factual finding was immaterial to its analysis of the scope language. Commerce found that "{t}he *Orders* do not treat 'fasteners' as an independent category of in-scope or out-of-scope merchandise." Final Scope Ruling at 11 (P.R. 6/5). Further, Commerce found that

> the term appears in the scope solely to describe how aluminum extrusion components may be attached during subassembly formation and to clarify that the inclusion of fasteners does not transform aluminum extrusion parts into an excluded finished good or finished goods kit. Neither sentence in the scope is intended to establish a rule regarding the scope status of fasteners themselves.

Final Scope Ruling at 11 (P.R. 6/5).

The interstitial factual finding is, however, important to resolving the scope analysis. Agencies broadly are under an obligation to state clearly the basis for administrative decisions. This is crucial for the regulated parties to ensure that they can fully vindicate their rights, for example through briefing, and a clear decision-making path is critical for judicial review. The Chenery doctrine is in place to ensure that these kinds of agency decisions walk through the building blocks for the outcome rather than merely present a conclusion. *See Securities and Exchange Commission v. Chenery Corp.*, 318 U.S. 80, 94 (1943) ("{T}he orderly functioning of the process of review requires that the grounds upon which the administrative agency acted by clearly disclosed and adequately sustained.").

Here, Commerce's refusal to take a definitive position on the issue of whether MBS's wall standoffs are fasteners as defined by the scope frustrates the ability of MBS to argue its case, and of this Court to review the decision. Given the primacy of the scope language itself in Commerce's determination in this case, a definition of its terms is crucial. Further, it is crucial that Commerce make those findings in each case to ensure that the parties can make robust arguments, Commerce's decisions provide predictability to regulated parties, and, in the context of scope proceedings, ensure that only covered merchandise is assessed duties. The record shows that MBS's wall standoffs are fasteners within the meaning of the scope and Commerce's prior determinations.

In the Final Scope Ruling, Commerce states that "{e}ven if MBS's products are 'fasteners in {their} entirety,' the product is nothing more than 'only aluminum extrusions,' even if referred to as fasteners and even if the product does serve a fastening function. An aluminum extrusion that fastens is still an aluminum extrusion." Final Scope Ruling at 10 (internal citations omitted) (P.R. 6/5). Further, Commerce found that "the scope's language merely clarifies that the

presence of fasteners as an attachment mechanism does not alter the status of the aluminum extrusion components being joined. Commerce, therefore, had no reason to make a definitive finding on that label." Final Scope Ruling at 10-11 (P.R. 6/5). A decision regarding whether MBS's wall standoffs are fasteners is, however, crucial to understanding whether they might be covered. The fact that the scope language does not resolve this question underlines the ambiguities highlights in the foregoing section. Whether MBS's wall standoffs are defined as fasteners is crucial to the ruling at issue here. Commerce's failure to definitively state a finding on this issue was inconsistent with the record and thus unsupported by substantial evidence.

2. *Fasteners Are Excluded from the Scope*

MBS has asserted throughout this scope proceeding that its wall standoffs are fasteners and are thus excluded by language included in the finished goods kit exclusion. The scope of the Orders states in pertinent part that:

> Subject aluminum extrusions may be described at the time of importation as parts for final finished products that are assembled after importation, including, but not limited to, window frames, door frames, solar panels, curtain walls, or furniture. Such parts that otherwise meet the definition of aluminum extrusions are included in the scope. The scope includes the aluminum extrusion components that are attached (e.g., by welding or fasteners) to form subassemblies, i.e., partially assembled merchandise unless imported as part of the finished goods 'kit' defined further below. The scope does not include the non-aluminum extrusion components of subassemblies or subject kits.
>
> . . .
>
> The scope also excludes finished merchandise containing aluminum extrusions as parts that are fully and permanently assembled and completed at the time of entry, such as finished windows with glass, doors with glass or vinyl, picture frames with glass pane and backing material, and solar panels. The scope also excludes finished goods containing aluminum extrusions that are entered unassembled in a "finished goods kit." A finished goods kit is understood to mean a packaged combination of parts that contains, at the time of importation, all of the necessary parts to fully assemble a final finished good and requires no further finishing or fabrication, such as cutting or punching, and is assembled "as is" into a finished product. An

> imported product will not be considered a "finished goods kit" and therefore excluded from the scope of the investigation merely by including fasteners such as screws, bolts, etc. in the packaging with an aluminum extrusion product.

*Orders* at 30,650, 30,654. The scope language contains two references to "fasteners." Implicit in those references is the premise that there is a category of merchandise described as fasteners that are excluded from the Orders.

In the first reference, the Department states that "{t}he scope includes aluminum extrusion components that are attached (*e.g.*, by welding or ***fasteners***) to form subassemblies…" *Orders* at 30,650, 30,654 (emphasis added). In that language Commerce clearly distinguishes subject aluminum extrusions from non-subject fasteners. Commerce does not reference or specify the metal from which the fasteners are made. The only conclusion that can be reached from such an omission is that the metal used to produce the fasteners is not the focus of Commerce's scope analysis.

In the second reference, the scope states "{a}n imported product will not be considered a 'finished goods kit' and therefore excluded from the scope of the Orders merely by including ***fasteners such as screws, bolts, etc.*** in the packaging with an aluminum extrusion product." *Orders* at 30,650, 30,654 (emphasis added). This includes a non-exhaustive list of the fasteners that are not considered part of the scope. Specifically, the scope language provides that the requirements of the exclusion will not be met simply by "including fasteners such as screws, bolts, *etc*." The "*etc*." indicates Commerce intended the list of fasteners that were not included in the scope of the *Orders* to be non-exhaustive.

The finished goods exclusion paragraph of the scope language establishes a general rule that a when a finished good (whether imported assembled or unassembled) is made up of both in-scope components and out-of-scope components, the entire finished good, including the in-scope

components, is excluded from the scope of the *Orders*. Having established that exclusion, the paragraph then describes an exception to the exclusion: "An imported product will not be considered a 'finished goods kit' and therefore excluded from the scope of the investigation merely by including fasteners such as screws, bolts, etc. in the packaging with an aluminum extrusion product." *Orders* at 30,650, 30,654. Commerce has previously found this sentence to establish an exception to the finished goods kit exclusion described in the preceding sentence, and the Federal Circuit has affirmed this understanding. *See Meridian Prods.*, 851 F.3d at 1383.

In *Meridian*, the Court observed that "Commerce contends that {the finished goods kit exclusion} contains an exception, which explains that '{a}n imported product will not be considered a 'finished goods kit' and therefore excluded from the scope of the Orders 'merely by including fasteners.'" *Id.* at 1383. Ultimately, the Court held that "Commerce did not err in its interpretation of the finished goods kit exclusion . . . Qualifying language further narrows the exclusion by reinforcing that 'mere' addition of fasteners will not bring a kit with only aluminum extrusions outside the scope of the Orders." *Id.* at 1384.

When viewed in its full context, the reference clarifies that even though generally a finished goods kit consisting of in-scope and out-of- scope components is excluded, a kit consisting of in-scope components and fasteners remains subject to the *Orders*. The clear implication of this is that "fasteners" are out-of-scope components; this is the only interpretation that gives meaning to the fastener exception provision. In *Meridian*, the Court held that "{w}here {} multiple sentences comprise an order's scope and 'there is no indication that one sentence helps to define the scope while the other does not,' we will not read out a sentence intended by Commerce to be given effect." *Id.* at 1383 (quoting *Allegheny Bradford Corp.*, 342 F. Supp. 2d at 1190). There is no need to mention the extrusions-and-fasteners-only scenario at

all, unless it falls within the original exclusion but is being treated differently. Therefore, the only logical interpretation is that merchandise defined as fasteners are always out-of-scope components, and as such would qualify the kit for the finished goods kit exclusion but for the restricting language.

There is no suggestion that the Order could be read to cover aluminum nails, aluminum drywall anchors, aluminum molly bolts, aluminum toggle bolts, or any of the vast array of aluminum fasteners available, if produced by extrusion from the relevant alloys. Those items are all fasteners that are used to attach something that they are not shipped with to a wall or other flat surface—just as MBS's wall standoffs do. This is exactly the kind of dynamic that must give voice to the references to fasteners in the scope language.

In the final ruling, Commerce found that "{i}n the first reference, fasteners are mentioned only as an example of how aluminum extrusion components may be joined to form subassemblies. Fasteners are not referenced as standalone, excluded merchandise, but rather to provide an example of subassemblies falling within scope." Final Scope Ruling at 11-12 (P.R. 6/5). Additionally, Commerce stated that "the second reference, fasteners are mentioned only to explain that merely adding trivial hardware, especially when the trivial hardware itself is an aluminum extrusion, does not change the scope status of a subject aluminum extrusion." *Id.* at 12 (P.R. 6/5). Commerce concluded that "{i}t is MBS who inserts a distinction not present in the scope language by claiming that any and all fasteners, regardless of physical characteristics or production process, are excluded based purely on their function." *Id.* (P.R. 6/5). As the basis for these conclusions, Commerce again states that "{t}he *Orders* cover aluminum extrusions made from alloys corresponding to series 1, 3, and 6, among others." *Id.* at 14 (P.R. 6/5).

Commerce's position relies largely on its finding that "{w}hile MBS' standoffs may indeed function as fasteners, that fact alone does not exempt them from the scope." *Id.* at 13 (P.R. 6/5). Commerce's position is that the function of MBS's wall standoffs is entirely immaterial because it does not make determinations based on function. That position is inconsistent with Commerce's analysis in the *Asia Sourcing* remand. In *Asia Sourcing*, Commerce found that components subject to the scope ruling "do not constitute fasteners because they do not have a fastening function, i.e. they do not attach the product to something else or attach components of the product to each other." Final Redetermination, *Asia Sourcing Corp.,* Ct. No. 13-00161; *see also* Scope Application at Ex. 12 at p. 10 (P.R. 38/10). That analysis demonstrates that, in certain situations, Commerce will consider function when determining scope coverage. Yet, Commerce has declined to do that here.

Commerce's analysis does not address the core of MBS's argument. MBS's argument is that the merchandise itself <u>is</u> a fastener. It is not a trivial addition or a subassembly; it is a stand-alone, finished fastener that purchasers buy for its fastening properties, not to evade the Orders. Although its components are made from extruded aluminum of one of the covered alloys, it is nevertheless a fastener, and the language of the scope indicates that fasteners are treated differently. Commerce's decision first declines to define MBS's product, and then states that textual references to fasteners do not indicate whether a fastener is or is not covered. Here, the coverage of fasteners like MBS's wall standoffs, is the crux of the scope question. The record of this proceeding indicates that MBS's merchandise is an excluded fastener and Commerce's conclusion to the contrary is unsupported by substantial evidence.

**C. COMMERCE'S PRELIMINARY ANALYSIS OF THE APPLICABILITY OF THE FINISHED GOODS EXCLUSION WAS DEFICIENT**

In the preliminary ruling, Commerce stated that "MBS' wall standoffs … serve as parts of a larger mounting system, and are not imported as complete, finished goods." Preliminary Scope Ruling at 12 (P.R. 20/4). The record demonstrates that with respect to standoffs that are imported fully assembled with all necessary components, this conclusion is unsupported by substantial evidence. The finished goods exclusion states that: "{t}he scope also excludes finished merchandise containing aluminum extrusions as parts that are fully and permanently assembled and completed at the time of entry, such as finished windows with glass, doors with glass or vinyl, picture frames with glass pane and backing material, and solar panels." *Orders* at 30,650, 30,654. In view of Commerce's determination not to consider whether MBS's wall standoffs are fasteners, this intermediate finding must be reviewed.

MBS's wall standoffs are in most cases imported as a single, complete unit, ready to be installed by the end-user. Commerce's assertion that the wall standoffs are "part of a larger mounting system" assumes how the end-user will use the merchandise. At the time of import it functions as a finished fastener, the ultimate use of which is entirely dependent on how the ultimate purchaser chooses to use the item. The guiding principle for the finished goods exclusion is that an individual unit must have a "consumptive or practical use." *Shenyang Yuanda Aluminum Industry Engineering Co., Ltd. v. United States*, 961 F. Supp. 2d 1291, 1298 (Ct. Int'l Trade 2014). In addition, the ability of each unit to function independently is key to finding that an individual piece of merchandise qualifies for the finished goods exclusion. *See Aluminum Extrusions Fair Trade Committee v. United States*, 617 F. Supp. 3d 1296, 1308 (Ct. Int'l Trade 2023) ("That degree of independence — rather than interdependence, as with Shenyang Yuanda's curtain wall units — makes Reflection's products finished goods."). In its

scope application, MBS noted that "{t}he products are sold directly to the end-user out of MBS's inventory in the same condition as imported. The products require no additional machining, fabrication, or other process and are ready for installation 'as is.'" Scope Application at 13 (P.R. 39/11). Wall standoffs may be purchased individually or as a group but do not depend on each other to achieve a final fastening function. Each wall standoff achieves its fastening function independently.

In *Shenyang Yuanda*, the court found that a curtain wall system was not a finished good because the curtain wall segments, though individually complete, "a number of curtain wall units are attached to form the completed curtain wall, the final finished product. Curtain wall units are therefore undeniably components that are fastened together to form a completed curtain wall. Thus, they are 'parts for,' and 'subassemblies' for, completed curtain walls." *Shenyang Yuanda*, 961 F. Supp. 2d at 1298. In that case the key finding was that there was no practical use for individual units because the design was for an entire curtain wall and the individual components would be useless individually. Specifically, the court stated that "a curtain wall unit's sole function is to serve as a part for a much larger, more comprehensive system: a curtain wall. All of this being the case, it is clear that curtain wall units are not finished merchandise but, rather, are parts for curtain walls." *Id.* at 1299.

By contrast, the Court's ruling in *Aluminum Extrusions Fair Trade Committee* found that window wall systems constituted excluded finished goods on the grounds that each individual unit could be used independently, even if use in a system was also practical. *Aluminum Extrusions Fair Trade Committee*, 617 F.Supp.3d at 1308. The Court found that

> Reflection's window wall systems have an individual, consumptive use; they can be installed in no particular order; they cannot cover a building's entire façade; and they serve different functions from a curtain wall. As they do not cover the building's entire façade, there is no set minimum number of units to purchase: One

> unit could theoretically suffice. Because each window wall system is a finished good, each shipment of window wall systems contains multiple finished goods.

*Id.* at 1307.

In *Aluminum Extrusions Fair Trade Committee*, the Court distinguished subject curtain wall panels, considered in *Shenyang Yuanda*, from the excluded window wall systems, observing that curtain wall panels have "no individual, consumptive use for each metal panel; and three of them are no more useful than one. The metal panels are entirely dependent on one another for their function." *Id.* at 1309.

MBS's wall standoffs are the same at the window wall systems considered in *Aluminum Extrusions Fair Trade Committee*. Each individual unit has an independent consumptive use as a fastener. The end-user may choose to install those fasteners in a group but the individual units achieve their fastening function without regard to whether the end-user uses them in a system or individually. *See* Scope Application at Exs. 1, 2 (demonstrating the fastening characteristics of individual wall standoffs) (P.R. 38/10). There is no additional processing that needs to occur after the units are imported. Once purchased, they are merely installed and used to fasten the end-users chose media to the wall.

Commerce's statement in the preliminary ruling that the wall standoffs were necessarily part of a system was inconsistent with the record. *See* Preliminary Scope Ruling at 12 (P.R. 20/4). For these reasons, Commerce's conclusion that the finished goods exclusion did not apply to MBS's wall standoffs was inconsistent with the record and therefore unsupported by substantial evidence.

## VI. <u>CONCLUSION</u>

The aluminum extrusions orders cover a lot of ground. Aluminum extrusions exist in a host of everyday products. It is crucial that antidumping and countervailing duty orders maintain

the connection to the original investigation in order to focus the remedy on the products that were the focus of that proceeding and that relief is focused on the petitioning companies. That is why Commerce and the Courts focus on the original language of the scope. As part of this architecture, "{a} petitioner has an obligation to be explicit and precise in its definition of the scope of the petition both prior and during the investigation." *Fedmet Res. Corp. v. United States*, 755 F.3d 912, 921 (Fed. Cir. 2014). The aluminum extrusions orders raise questions about whether that burden was met. Here this Court must consider whether the order has once again wandered from its original meaning and brought in merchandise that was never intended to be covered and could not injure the petitioning companies. MBS submits that the record before this Court demonstrates that its wall stand offs are out-of-scope and ask this Court to remand Commerce's findings for proceedings consistent with that finding.

Respectfully submitted,

/s/ Heather Jacobson
Heather Jacobson
NAKACHI, ECKHARDT, AND JACOBSON P.C.
450 Alaska Way South, Suite 200
Seattle, WA 98104
Phone: (206) 774-0927
Email: HJacobson@TradeLawCounsel.com
*Counsel to HTM MBS LLC*

Dated: October 2, 2026

**CERTIFICATE OF COMPLIANCE**

Undersigned counsel hereby certifies that the foregoing Brief in Support of HTM MBS LLC's Rule 56.2 Motion for Judgment on the Agency Record, complies with the wordcount limitation set forth in the Court's August 6, 2026 Scheduling Order. The relevant sections of the Brief contain 8,517 words according to the word-count function of the word-processing software used to prepare the brief.

Respectfully submitted,

/s/ Heather Jacobson
Heather Jacobson
NAKACHI, ECKHARDT, AND JACOBSON P.C.
450 Alaska Way South, Suite 200
Seattle, WA 98104
Phone: (206) 774-0927
Email: HJacobson@TradeLawCounsel.com
*Counsel to HTM MBS LLC*

Dated: October 2, 2026